1

2

**Lewis Roca Rothgerber Christie LLP**
201 E. Washington Street, Suite 1200
Phoenix, AZ 85004-2595

3

4

Stephen M. Bressler (State Bar No. 009032)
Direct Dial: 602-262-5376
Direct Fax: 602-734-3742
E-mail:  SBressler@LRRCLaw.com

5

6

**Pepper Hamilton LLP**
Sean P. Fahey (Admitted *Pro Hac Vice*)
3000 Two Logan Square

7

Eighteenth and Arch Streets

8

Philadelphia, PA  19103-2799
Direct Dial: 215-981-4296

9

Direct Fax: 215-689-4642
E-mail: faheys@pepperlaw.com

10

11

**Pepper Hamilton LLP**
Kenneth J. King (Admitted *Pro Hac Vice*)
The New York Times Building

12

620 Eighth Avenue
New York, NY 10018-1405

13

Direct Dial: 212-808-2703
Direct Fax: 212-658-9301

14

E-mail: kingk@pepperlaw.com

15

Attorneys for Defendants

16

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

17

18

Kathryn Marie Jones,

No.  2:14-cv-00383-SPL

19

Plaintiff,

20

v.

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

21

22

Medtronic, Inc.; Medtronic Sofamor
Danek; Medtronic Sofamor Danek
USA, Inc.; Medtronic Spinal &
Biologics; Medtronic; Medtronic plc; et
al.

23

**(ORAL ARGUMENT REQUESTED)**

24

Defendants.

25

26

27

28

1
2
3
4
5

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, Defendants respectfully move this Court for an Order dismissing the First Amended Complaint (the "Amended Complaint") filed by Plaintiff, appearing *pro se*, for failure to state a claim on which relief can be granted and for lack of personal jurisdiction.[1]  This Motion is supported by the following Memorandum of Points and Authorities.

6

## I.   INTRODUCTION

7
8
9
10
11
12
13
14
15
16

This is Plaintiff's second attempt in this Court to state a claim against Medtronic for purported injuries allegedly caused by the Infuse® Bone Graft/LT-CAGE® Lumbar Tapered Fusion Device ("Infuse"), Medtronic polymer cage devices, and other Medtronic devices supposedly used by her surgeons during her October 2010 surgeries, performed in Dallas, Texas.  By its March 6, 2015 Order ("2015 Order"), this Court dismissed all of Plaintiff's claims in her original Complaint either as expressly preempted by 21 U.S.C. § 360k(a) as interpreted in *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), impliedly preempted by 21 U.S.C. § 337 as interpreted in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), or because Plaintiff did not adequately plead her claim and repleading would be futile.  2015 Order, Doc. No. 65.

17
18
19
20
21
22
23

On appeal, the Ninth Circuit affirmed this Court's dismissal of Plaintiff's various fraud claims as either preempted or inadequately pled.  *Jones v. Medtronic, Inc.*, 2018 U.S. App. LEXIS 25474, at *4-5 (9th Cir. Sep. 7, 2018).  The Ninth Circuit also ruled Plaintiff's design-defect claims preempted and her negligence *per se* claims preempted as to **both** the Infuse Device (a Class III device, subject to the premarket approval process under 21 U.S.C. § 360, *Riegel*, 552 U.S. at 325) and the Class II cage devices (which are subject to 21 U.S.C. § 510(k) approval as "'substantially equivalent' to a pre-existing

24
25
26
27
28

---

[1] Plaintiff's Amended Complaint names, as Defendants, Medtronic, Inc., Medtronic Sofamor Danek USA, Inc. and Medtronic plc.  The Amended Complaint also names "Medtronic," "Medtronic Sofamor Danek" and "Medtronic Spinal & Biologics," none of which are legal entities.  *See* Ziebell Declaration (attached as Exhibit A).  Medtronic Sofamor Danek USA, Inc. is responsible for the manufacture of the Infuse Device and did so at the time of Plaintiff's 2010 surgeries.  *Id.* ¶ 3.  The other legal entities are not the proper parties for claims asserted against the product manufacturer.  The Defendant legal entities will be referred to collectively herein as "Medtronic," the "Medtronic Defendants," or by their individual corporate names.

1    device"). *Id.* at *5; *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).[2]  But, the Ninth Circuit

2    permitted Plaintiff, on remand, to "attempt" to replead a parallel Arizona state-law

3    "'misbranding'" claim, having failed adequately to do so in her initial Complaint.  The

4    Ninth Circuit also permitted Plaintiff to attempt to plead, for the first time, a

5    manufacturing-defect claim, a design-defect claim as to Class II devices, and a failure-to-

6    warn claim under *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013).

7         Now, post remand, Plaintiff has filed her Amended Complaint, which contains

8    several claims and names new Defendants. But notwithstanding the opportunity to

9    amend, Plaintiff's Amended Complaint still fails for several reasons.  First, this Court

10   lacks personal jurisdiction over any of the Defendants and Plaintiff makes no allegations

11   supporting jurisdiction.[3]  Second, Plaintiff alleges "failure to warn," "misbranding and

12   adulteration" and fraud claims, but these claims should be dismissed for the same reasons

13   this Court held previously—they fail to state a cause of action and/or are preempted.

14   Third, Plaintiff's new manufacturing and design defect claims similarly do not state a

15   claim and/or are preempted.[4]

16        As to lack of jurisdiction, none of the Medtronic Defendants is incorporated or has

17   its principal place of business in Arizona; one, Medtronic plc, is an Irish holding

18   company **which did not even exist at the time of Plaintiff's surgeries**, which took place

19

20        [2] After the Ninth Circuit ruled, Plaintiff moved for panel rehearing, arguing that "the Court should amend its [original August 16, 2018 Memorandum Opinion to] hold

21   that the claims concerning the Class II devices are not preempted[.]" Appellant Kathryn Marie Jones's Petition for Panel Rehearing at 1, *Jones v. Medtronic, Inc.*, No. 15-15653

22   (9th Cir. Aug. 29, 2018), ECF No. 76.  In response, the Court issued an amended opinion clarifying that the preemption of the negligence *per se* claims *also* applied to the Class II

23   cages and that, since Plaintiff never asserted a design-defect claim on any Class II device, any leave to assert such a claim would be left to this Court's discretion.

24        [3] Plaintiff's original Complaint named "Medtronic," but was served on Medtronic, Inc.  There is no legal entity by the name "Medtronic."  Def. Medtronic, Inc.'s Mot. to

25   Dismiss Pl.'s Compl. at 1 n.1, Doc. No. 17.  Medtronic, Inc. moved to dismiss the original Complaint and maintained that it was not a proper party in the case.  *See id.*  To

26   the extent the Court views this action as a waiver of jurisdiction as to Medtronic, Inc. with respect to this Amended Complaint, the remaining Defendants assert that they are

27   contesting jurisdiction and are making no such waiver here.
          [4] Apparently aware of the Arizona Supreme Court's recent holding in *Conklin v.*

28   *Medtronic , Inc.*, 2018 Ariz. LEXIS 463, at *20 (Ariz. Dec. 18, 2018) that "*Stengel* incorrectly recited and applied Arizona law," Plaintiff makes no claim under *Stengel*.

in Texas, not Arizona.  As to the Amended Complaint's causes of action, none satisfy Rule 8's pleading standards under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The "failure-to-warn" claim comprises nothing more than conclusory statements and survives neither Rule 8 nor preemption.  It is also based on a false premise:  that the FDA-mandated labelling revisions were not included in Infuse's label at the time of Plaintiff's surgeries. A plain reading of the label shows otherwise.  In addition, Plaintiff's second attempt at alleging a parallel "misbranding" claim fares no better than her previous attempt, and her "adulteration" claim is similarly defective; there is no private right of action under the Arizona Pharmacy Act (so Plaintiff has no standing to sue under it), and her claims do not avoid preemption.  Finally, to the extent Plaintiff asserts a claim under Arizona's Consumer Fraud Act, she is estopped from doing so by the Ninth Circuit's affirmance of this Court's dismissal with prejudice of her previous fraud claims.  To the extent that her Consumer Fraud claim alleges that Medtronic failed to warn about what she calls "unapproved" uses of Infuse, her claim is preempted as well.  Her manufacturing- and design-defect claims fail to allege *any* defect, and fail to connect any purported aspect of manufacturing or design of the Class II cages to the injuries she alleges.

For these reasons and the reasons set forth below, Defendants respectfully request that Plaintiff's Amended Complaint be dismissed with prejudice.

## II.      STATEMENT OF FACTS

The Amended Complaint is based on the same alleged medical history as Plaintiff's original Complaint.  Plaintiff alleges she underwent spinal surgeries performed by her physicians at Texas Health Presbyterian Hospital in Dallas, Texas.  Am. Compl. ¶¶ 1, 6; Am. Compl., Attach. 1; 2015 Order at 2.  Plaintiff alleges her physicians used the Infuse Device in an "off-label" manner – *i.e.*, in a manner not indicated on the Device's labeling – including by using a lateral rather than anterior approach and by using polymer cages instead of the titanium cage indicated in the Infuse Device's FDA-approved warning label.  Am. Compl. ¶¶ 13, 215, 248.  That label specifically addresses potential off-label use and the risks associated therewith:

- "When degenerative disc disease was treated by a posterior lumber interbody fusion procedure with cylindrical threaded cages (INTER FIX™ devices), posterior bone formation was observed in some instances." (Request for Judicial Notice ("RJN,") Ex. B);

- **"The INFUSE Bone Graft Component <u>must not</u> be used without the [LT Cage]"** (*Id.*) (bold and underline in original); and

- "The safety and effectiveness of the InFUSE Bone Graft component with other surgical implants, implanted at locations other than the lower lumbar spine, or used in surgical techniques other than anterior open . . .or anterior laparoscopic approaches . . . have not been established." (*Id.*).

The label also describes the numerous side effects associated with the Device, many of which Plaintiff alleges she has. (*Id.*)

### A.   Statutory And Regulatory Background

In 1976, the Medical Device Amendments (MDA) granted FDA exclusive authority to regulate medical devices and created a "regime of detailed federal oversight." *Riegel*, 552 U.S. at 316. Recognizing the "undu[e] burden[]" of differing state regulation, Congress adopted a "general prohibition on non-Federal regulation" of medical devices. H.R. Rep. No. 94-853, at 45 (1976). Codified at 21 U.S.C. § 360k(a), the MDA's express-preemption provision specifies that no state may impose "any requirement" relating to the safety or effectiveness of a medical device that "is different from, or in addition to, any requirement applicable . . . to the device" under federal law. *Id.*

Under the MDA, innovative Class III devices, like the Infuse Device, "incur the FDA's strictest regulation" and must receive Premarket Approval (PMA) from FDA before being marketed. *Buckman*, 531 U.S. at 344. "Premarket approval is a 'rigorous' process." *Riegel*, 552 U.S. at 317. Before approving a device, FDA reviews the device's proposed labeling to "evaluate[] safety and effectiveness under the conditions of use set forth on the label and must determine that the proposed labeling is neither false nor misleading." *Id.* at 318 (citation omitted). FDA "grants premarket approval only if it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness.'" *Id.* (quoting 21 U.S.C. § 360e(d)).

FDA's regulatory role does not end with approval of an initial PMA application. "Once a device has received premarket approval, the MDA forbids the manufacturer to

make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id.* at 319. A manufacturer who wishes to make such changes must submit a PMA Supplement and generally may not implement the proposed changes without FDA approval. *See id*. The PMA Supplement is subject to the same rigorous standards of review as an initial PMA application. *Id.*

The FDCA grants FDA extensive and exclusive-enforcement authority. Congress has specified that all actions to enforce the FDCA "shall be by and in the name of the United States." 21 U.S.C. § 337(a). Although "citizens may report wrongdoing and petition the agency to take action," there is no private right of action to enforce the FDCA. *Buckman*, 531 U.S. at 349, 349 n.4. Consistent with its exclusive-enforcement power under the FDCA, FDA has the authority to investigate violations of the Act and "has at its disposal a variety of enforcement options that allow it to make a measured response" to any wrongdoing. *Id.* at 349. Those enforcement options include "injunctive relief, 21 U.S.C. § 332, and civil penalties, 21 U.S.C. § 333(f)(l)(A); seizing the device, § 334(a)(2)(D); and pursuing criminal prosecutions, § 333(a)." *Id.*

### B. Premarket Approval Of The Infuse Medical Device

FDA granted premarket approval to the Infuse Device in 2002, after nearly 1 ½ years of agency scrutiny.[5] Agency records confirm the text of the Device's FDA-approved warning label, the InFUSE Bone Graft/LT-CAGE Lumbar Tapered Fusion Device Important Medical Information (IMI).[6]

---

[5] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm? id= P000058 (last visited Jan. 17, 2019); https://www.accessdata.fda.gov/cdrh_docs/pdf/ P000058A.pdf (last visited Jan. 17, 2019). The Court may take judicial notice of Infuse's premarket approval; it is a record of official agency action that is readily determined and cannot reasonably be questioned. Fed. R. Evid. 201(b); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Toth v. Grand Trunk R. R.*, 306 F.3d 335, 349 (6th Cir. 2002); *Erickson v. Boston Scientific Corp.*, 846 F. Supp. 2d 1085, 1088-89 (C.D. Cal. 2011).

[6] *See* https://www.accessdata.fda.gov/cdrh_docs/pdf/P000058C.pdf (last visited Jan. 17, 2019) (RJN, Ex. A). The FDA-approved labeling is also subject to judicial notice because it is an official record that is published by the agency and cannot reasonably be questioned. Fed. R. Evid. 201(b); *Toth*, 306 F.3d at 349; *see, e.g., Chapman v. Abbott Labs.*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013) (judicial notice of FDA-approved drug label published on FDA website); *Gross v. Stryker Corp.*, 858 F.

### C.     Off-Label Use Of Medical Devices

Off-label use of medical devices is not only common practice but often the standard of care for patient treatment.  The Supreme Court has explained that "'off-label' usage of medical devices . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman,* 531 U.S. at 350; *see also Caplinger v. Medtronic, Inc*., 921 F. Supp. 2d 1206, 1218 n.3 (W.D. Okla. 2013) ("*Caplinger I*").  FDA's oversight of medical devices is subject to a critical and overarching limitation imposed by Congress: FDA is prohibited by law from "limit[ing] or interfer[ing] with the authority of a health care practitioner to administer any legally marketed device to any patient for any condition or disease."  21 U.S.C. § 396.  Accordingly, "FDA's approval process generally contemplates that approved [devices] will be used in off-label ways."  *United States v. Caronia*, 703 F.3d 149, 166 (2d Cir. 2012).  Thus, in establishing the premarket approval system to help ensure patient access to devices with a reasonable assurance of safety and effectiveness, Congress was adamant that the federal government not regulate the practice of medicine.  Congress therefore empowered FDA to decide whether a new device may be sold, but forbade the agency to regulate how an approved device may be *used.*

Plaintiff refers to off-label uses as "unapproved uses," but FDA has said that "[t]he term 'unapproved uses' is . . . misleading," because the agency does not regulate the use of medical products.  U.S. Food & Drug Admin., *Use of Approved Drugs for Unlabeled Indications,* 12 FDA Drug Bull. 4, 5 (1982).  Rather than approve or disapprove particular *uses,* FDA instead approves or disapproves *devices* and their labeling.

### III.     FACTS PERTAINING TO PERSONAL JURISDICTION

### A.     Medtronic, Inc.  Medtronic, Inc. is a corporation organized and existing under the laws of Minnesota with its principal place of business and headquarters in Minneapolis, Minnesota.  Ziebell Declaration ¶ 5.

---

Supp. 2d 466, 481 n.26 (W.D. Pa. 2012) (notice of medical-device label); 2015 Order at 8 n. 6.

**B.   Medtronic Sofamor Danek USA, Inc.**  Medtronic Sofamor Danek USA, Inc. is a corporation organized and existing under the laws of Tennessee with its principal place of business and headquarters in Memphis, Tennessee.  Medtronic Sofamor Danek USA, Inc. is responsible for developing, manufacturing and distributing the Infuse Device.  *Id.* ¶¶ 3, 7.

**C.   Medtronic plc.**  Medtronic plc is a public limited holding company organized under the laws of the Republic of Ireland, and whose shares are listed on the New York Stock Exchange.  Medtronic plc was formed in 2014, nearly four years *after* Plaintiff's surgeries, pursuant to the laws of the Republic of Ireland.  Medtronic plc's principal place of business is located in Dublin, Ireland.  *Id.* ¶ 8.[7]

## IV.   ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to overcome a motion to dismiss.  *Id.*  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.*  Moreover, Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *id.*, and "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

In moving to dismiss pursuant to Rule 12(b) for lack of personal jurisdiction, a defendant is permitted to submit affidavits, depositions and exhibits without converting the motion to one for summary judgment.  *See Carrasco ex rel. Carrasco v. Almazrodei*, 252 F. App'x 850, 851 (9th Cir. 2007); *Pope & Talbot, Inc. v. USDA*, 782 F. Supp. 1460

---

[7] The Amended Complaint also names "Medtronic," "Medtronic Spinal & Biologics" and "Medtronic Sofamor Danek," which are not legal entities.  To the extent the latter refers to Medtronic Sofamor Danek, Inc., that entity is a corporation organized and existing under the laws of the State of Indiana with its principal place of business and headquarters in Memphis, Tennessee.  Ziebell Declaration ¶ 6.

(D. Or. 1991) (quoting *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989)).  In addition, on a motion to dismiss, the Court must ignore allegations that contradict documents referenced in the complaint or facts that are subject to judicial notice.  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *see also Lakin Cattle Co. v. Thaler*, 419 P.2d 66, 68 (Ariz. 1966).

When a defendant moves to dismiss a complaint for lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing personal jurisdiction."  *Hummingbird Def. Sys. v. Ye*, 2007 U.S. Dist. LEXIS 47953, at *2 (D. Ariz. June 26, 2007).  To satisfy that burden, "the plaintiff is 'obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction' over the defendant."  *Id.* (citing *Cummings v. W. Trial Lawyers Assoc.*, 133 F. Supp. 2d 1144, 1151 (D. Ariz. 2001)).

### A.   This Court Should Dismiss the Amended Complaint for Lack of Personal Jurisdiction

#### 1.   Personal jurisdiction exists only in a forum where the defendant is "at home" or where a defendant's contacts with the forum are the cause of the plaintiff's injuries

The Supreme Court has identified two categories of personal jurisdiction: "general or all-purpose jurisdiction, and specific or conduct-linked jurisdiction."  *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014).  "A court may assert general jurisdiction over foreign (sister state or foreign-country) corporations to hear any and all claims against them when their affiliations with the [s]tate are so 'continuous and systematic' as to render them essentially at home in the forum [s]tate."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).  "Specific jurisdiction, on the other hand, depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the [s]tate's regulation."  *Id.* (citation omitted).  Plaintiff cannot meet her burden of establishing facts showing jurisdiction under either category.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d

1007, 1019 (9th Cir. 2002) ("[O]n a motion to dismiss [for lack of personal jurisdiction], the plaintiff bears the burden of establishing that jurisdiction exists.").

### 2. None of the defendants are subject to general jurisdiction

In *Daimler*, the Supreme Court acknowledged that while a corporate defendant may be considered to be "at home" where it is incorporated and where its principal place of business is located, a corporation is not "at home" in a jurisdiction merely because the corporation has significant sales in the forum. *See* 571 U.S. at 139 ("If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable."); *Wal-Mart Stores, Inc. v. Lemaire*, 395 P.3d 1116, 1121-22 (Ariz. Ct. App. 2017) (no general jurisdiction in Arizona over Walmart, notwithstanding that the company had a substantial presence in Arizona and was the leading employer in the state.).[8]

In this case, the Court lacks general jurisdiction over the Medtronic Defendants because none are incorporated in Arizona and none have their principal place of business in Arizona. A company "that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20. If simply conducting business within a state were enough for general jurisdiction, then a plaintiff could sue "in every State in which a corporation engages in a substantial, continuous, and systematic course of business." *Id.* at 137-38. But the *Daimler* Court rejected that result. *Ibid.* What is more, any contacts

---

[8] Nor, in this case of the Irish holding company, Medtronic plc, can a corporate defendant be dragged into court on the basis of its subsidiary's contacts with the forum state. *See Daimler AG*, 571 U.S. at 136 (MBUSA's contacts with California not a basis for haling Daimler AG into court). Instead, to give rise to jurisdiction, whether general or specific, the contacts with the forum state must be those of the parent corporation itself—and not merely the contacts of its subsidiary. *See id.*; *see also Houghton v. Piper Aircraft Corp.*, 542 P.2d 24, 27 (Ariz. 1975) ("The mere presence in this state of products manufactured by Piper and Sensenich is insufficient to establish personal jurisdiction."); *Deere & Co. v. Superior Court*, 503 P.2d 967, 970 (Ariz. Ct. App. 1972) ("The mere relationship of parent corporation and subsidiary corporation is not of itself a sufficient basis for holding that the parent corporation has 'presence' in the forum state."). Nor can general jurisdiction over the parent be deemed general jurisdiction over the parent's subsidiaries absent those subsidiaries being "at home" in the forum state. *See generally Goodyear*, 564 U.S. 915.

by any of the Medtronic Defendants with Arizona are not a basis for exercising jurisdiction regarding surgeries in Texas.  *See id.* at 136-37; *Wal-Mart*, 395 P.3d at 1122. There is thus no basis for exercising general jurisdiction over these defendants.

### 3. Because Plaintiff's surgery was in Texas, the Defendants are not subject to specific jurisdiction in Arizona

In contrast to general jurisdiction, specific jurisdiction "focuses on the relationship between the defendant, the forum, and the litigation."  *Batton v. Tenn. Farmers Mut. Ins. Co.*, 736 P.2d 2, 5 (Ariz. 1987) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).  "In order for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 582 U.S. __, 137 S. Ct. 1773, 1780 (2017) (emphasis in original) (quoting *Daimler*, 571 U.S. at 118).  Specific jurisdiction requires that there "be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or occurrence that takes place in the forum [s]tate.'"  *Id.* (quoting *Goodyear*, 564 U.S. at 919).  As the Supreme Court reiterated in *Bristol-Myers Squibb*, "[a] corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'"  *Id.* at 1781 (quoting *Goodyear*, 564 U.S. at 927, in turn quoting *International Shoe*, 326 U.S. at 318).  Under Ninth Circuit law, to establish this Court's jurisdiction over the Medtronic Defendants, Plaintiff must show that she would not have been injured "but for" their actions in Arizona.  *See Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).  She cannot do so.

The Amended Complaint contains no well-pleaded factual allegations with respect to any purported relevant actions by any of the Medtronic Defendants in Arizona. Instead, Plaintiff appears to base jurisdiction on the allegations that Medtronic names "appear on the labels of [Plaintiff's] implanted medical products" and "medical product manuals, websites, press releases, signage, etc."  Am. Compl. ¶ 2.  She also alleges that "Medtronic" "maintains a manufacturing/distribution center in . . . Arizona which

1    generates twenty percent of Medtronic's income." *Id.* ¶ 4.  But the fact that the

2    Medtronic name appears in labels, manuals and other materials hardly establishes

3    personal jurisdiction.  Moreover, *Daimler* and *Bristol-Myers Squibb* tell us that a business

4    presence in Arizona is insufficient for jurisdiction.  *See Wal-Mart*, 395 P.3d at 1121-22.

5    As noted, Plaintiff's claims here arise from spinal surgeries she underwent in October

6    2010 in Texas—not Arizona.  There is no basis for specific jurisdiction over the

7    Medtronic Defendants.  *See Walden v. Fiore,* 571 U.S. 277 (2017) (no specific

8    jurisdiction in Nevada over out-of-state defendant who injured Nevada residents in

9    Georgia, even though the Nevada residents suffered foreseeable harm in Nevada).

10       **B.    Plaintiff's Failure-to-Warn Claim Fails to State a Claim and/or**
11           **is Expressly Preempted**

12       The Amended Complaint adds a failure-to-warn claim premised on the erroneous

13   allegation that Medtronic failed to make modifications to Infuse's labeling required by

14   FDA in March 2008.  Am. Compl. ¶ 203.  Plaintiff makes this allegation based solely on

15   what she describes as "exhaustive online search."  *Id*. ¶ 204.  Plaintiff alleges that the

16   supposedly unmade modifications "would have informed [her] surgeon . . . that

17   Medtronic Infuse Bone Graft biologic material should only be used with the LT-Cage

18   Lumbar Tapered Fusion Device and ACS absorbable collagen sponge – 'and not with

19   other devices or components.'"  *Id*. ¶ 232.  Without explaining its purported relevance to

20   her 2010 surgery, Plaintiff alleges Infuse's 2015 Label[9] fails to list certain adverse events

21   purportedly associated with use of the Device.  *Id*. ¶ 224.

22       Plaintiff's failure-to-warn claim fails on a number of grounds.  First, a plain

23   reading of Infuse's judicially noticeable June 2009 label, in effect at the time of

24   Plaintiff's surgeries, shows that the label did, in fact, include the information that Plaintiff

25   alleges was not included.  For example, Plaintiff cites to a November 2007 FDA

26   document directing that modifications be made to the Infuse labeling as of March 2008.

27   Based on this document, she alleges that the June 2009 Infuse label (the label in effect at

28   ────────────────

[9] Plaintiff tacitly admits she did not review the FDA-mandated label in effect at
the time of her surgeries as she was unable to find it on the internet.  Am. Compl. ¶ 204.

the time of her surgeries) did not include additional language "stating that the components of the product may only be used together and not with other devices or components." Am. Compl. ¶ 203. However, a comparison between the label in effect in March 2007 and in June 2009 shows that such language *was* added. And the 2009 label includes the following: "**The Infuse® Bone Graft component <u>must</u> <u>not</u> be used without the Medtronic Titanium Threaded Inbody Fusion Device component**." *Compare* RJN, Ex. B (2009 label) (emphasis in original) *with* RJN, Ex. C (2007 label); RJN, Ex D (highlighting relevant changes).

Plaintiff further alleges that the 2009 label did not include warnings related to transient bone absorption and ectopic bone formation and adverse event information from a clinical post-approved study. Am. Compl. ¶ 203. A review of the warnings section of the 2009 label shows that Plaintiff's allegation is untrue – the 2009 label has added language referencing "resorption of trabecular bone that may be transient," and "nerve compression associated with ectopic bone formation." RJN, Exs. B, C, D. In addition, the 2009 label has an added section entitled "Post-Approval Study" reflecting the adverse event information from a clinical post-approval study. Second, Plaintiff alleges that her surgeries used Infuse off-label by using the Device without the LT/titanium cage, Am. Compl. ¶¶ 69, 136, with a lateral, not anterior approach, Am. Compl. ¶ 128, and at multiple levels of the lumbar spine, Am. Compl. ¶136. She alleges that she incurred multiple injuries as a result, including nerve damage and bowel and bladder conditions. Am. Compl. ¶ 20. But Plaintiff cannot say her alleged injuries arose from a failure to warn, because she and—more relevantly given the learned intermediary doctrine (*see Watts v. Medicis Pharm. Corp.*, 365 P.3d 944 (Ariz. 2016))—her surgeons *were* warned against the off-label uses of which she complains and of the risks associated with Infuse's use. They were warned, in the first instance, by Infuse's FDA-approved label, which warned that Infuse was to be implanted only (1) at one level of the lumbar spine (2) via an anterior approach (3) that "**[t]he InFUSE Bone Graft component <u>must not</u> be used**

**without the [LT Cage]**," that "posterior bone formation was observed in some instances" when the bone graft component was used "with cylindrical threaded cages" rather than the tapered LT-Cage, and that "[t]he safety and effectiveness of the InFUSE Bone Graft component with other surgical implants . . . have not been established." RJN, Ex. B (emphasis in original). The label, which also informed doctors and the public that "high" rates of "back and leg pain" and "bone resorption" had been observed among patients treated with Infuse, also warned that "nerve damage," "cessation of any potential growth of operated portions of the spine," "[b]owel or bladder problems," "damage to blood vessels," "disassembly, bending, breakage, loosening, and/or migration of components," "ectopic and/or exuberant bone formation," "non-union (or pseudoarthrosis), delayed union, mal-union" and "[c]hange in mental status" are among "potential adverse events which may occur with spinal fusion surgery with the InFUSE Bone Graft." *Id.* It also advises that "[a]dditional surgery may be necessary to correct some of these potential adverse events." *Id.*

Plaintiff identifies risks associated with Infuse: "bone resorption; bowel or bladder problems; damage to blood vessels; damage to internal organs and connective tissue; disassembly, bending, breakage, loosening and/or migration of components; heterotopic and/or exuberant bone formation; infection; itching; neurological system compromise; non-union (or pseudoarthrosis); pain; postoperative change in spinal curvature, loss of connection, height and/or reduction and tissue or nerve damage." Am. Compl. ¶ 224. Each of these risks, however, is identified in the Device's 2009 label, and each applies to *all* uses of the Device, whether on- or off-label. RJN, Ex. B. Thus, as another court recently recognized, "[t]he FDA-approved label clearly warns of the risks associated with use of the BMP/Sponge – both off-label and on-label – experienced by Plaintiffs." *Hafer v. Medtronic*, 99 F. Supp. 3d 844, 860 (W.D. Tenn. 2015).

Moreover, to the extent Plaintiff alleges state law required Medtronic to give

additional warnings other than those FDA required,[10] her failure-to-warn claim runs

headlong into § 360k(a).  As the Supreme Court explained, § 360k(a) "[s]urely . . . would

pre-empt a jury determination that the FDA-approved labeling for a [device] violated a

state common-law requirement for additional warnings."  *Riegel*, 552 U.S. at 329; *see*

*also id.* at 320 (affirming dismissal of "claims of strict liability . . . and negligence in the .

. . labeling . . . of the [device]"); *accord*, *e.g.*, *Caplinger v. Medtronic, Inc*., 784 F.3d

1335, 1345-46 (10th Cir. 2015) ("*Caplinger II*"); *Wolicki-Gables v. Arrow Intl., Inc*., 634

F.3d 1296, 1301-02 (11th Cir. 2011); *In re Medtronic, Inc.* (*Bryant v. Medtronic, Inc.*),

623 F.3d 1200, 1205 (8th Cir. 2010); *McMullen v. Medtronic, Inc*., 421 F.3d 482, 489-90

(7th Cir. 2005); *Hafer*, 99 F. Supp. 3d at 858-60; *Brady v. Medtronic*, 2014 U.S. Dist.

LEXIS 52151, at *22 (S.D. Fla. Apr. 8, 2014).

### C.   Plaintiff's Misbranding and Adulteration Claims Fail to State a Claim and are Preempted

In an apparent effort to take advantage of the Ninth Circuit allowing her another

attempt to plead a parallel state-law misbranding claim, Plaintiff purports to assert such a

claim under the Arizona Pharmacy Act,[11] a statute she invoked in her Ninth Circuit

appeal, but which the Ninth Circuit did not find sufficient to avoid preemption.  *See, e.g.*,

Plaintiff-Appellant's Reply Brief at 5, 13, 19, *Jones v. Medtronic , Inc.*, No. 15-15653

(9th Cir. Feb. 1, 2016) Doc. No. 19-1; *Jones*, 2018 U.S. App. LEXIS 25474.  Plaintiff

alleges "Medtronic intentionally violated the . . . Act when it substituted Medtronic Peek

Clydesdale [cages] and Medtronic Peek Capstone [cages] for the Medtronic Titanium

[LT-Cage]."  Am. Compl. ¶¶ 259-60.  But her Amended Complaint contains no plausible

allegation that Medtronic "substituted" any cages.  Medtronic is a manufacturer; it does

not practice medicine.  Plaintiff's surgeon, not Medtronic, decided which cages would be

used in her surgery.  Thus, if anyone "substituted" cages, it was Plaintiff's surgeon, who

did so and who, by statute, had the right to do so.  *See* 21 U.S.C. § 396; *Buckman*, 531

---

[10] *See* Am. Compl. ¶ 224 (alleging the adverse events in Infuse's 2015 label "would be much longer" had it warned about "other devices").

[11] Arizona Rev. Statute: Title 32 – Chapter 18.

U.S. at 350; *Caplinger II*, 784 F.3d at 1336 (in enacting the MDA, Congress "preserv[ed] the freedom of . . . doctors to use potentially life-saving technology as they see fit"). Plaintiff's adulteration claim similarly is premised on the erroneous notion that Medtronic, not Plaintiff's physician, "substituted" cages.  Moreover, the gravamen of Plaintiff's misbranding claim appears to be the allegation that Medtronic "failed to provide adequate directions for use or adequate warnings" about using the Device with cages other than the titanium LT-Cage.  Am. Compl. ¶ 260.  In other words, Plaintiff contends that the FDA-approved warning with respect to cages — the bold-faced warning that "**[t]he Infuse Bone Graft component <u>must</u> <u>not</u> be used without the [LT-Cage]**" RJN, Ex. B — was somehow insufficient.

Plaintiff's purported misbranding and adulteration claims fail for various reasons.  First, for the reasons stated above, the Amended Complaint does not allege any factual basis for either claim.  Second, under Section 337(a), state-law claims "are not saved merely by being recast as violations of the federal adulteration and misbranding statutes." *Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1301 (D. Colo. 2008).  Indeed, any argument that Plaintiff's "claims are not preempted because the [device] was 'adulterated'" or misbranded "*must fail*," because "violations of the FDCA do not create private right of action" and "only the government has a right to take action with respect to adulterated [or misbranded] products."  *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3d Cir. 1994) (emphasis added); *see also Purchase v. Advanced Bionics, LLC*, 896 F.Supp.2d 694, 696 (W.D.Tenn. 2011) ("Claims premised on [the] derivative assertion that the . . . device . . . was 'adulterated' or 'misbranded' . . . are also preempted.").  Thus, to the extent Plaintiff alleges the Device was adulterated, her claim is impliedly preempted.  Further, it is important to note that in addition to there being no private rights of action under the FDCA, Plaintiff cannot conjure a private right of action under the Arizona Pharmacy Act, either.  *See* A.R.S. § 32-1991, "Enforcement of this Chapter" ("The state board of pharmacy, the division of narcotics enforcement and criminal

intelligence within the department of public safety, all officers exercising police powers, and county attorneys shall enforce the provisions of this Chapter, unless such enforcement is otherwise specifically delegated. . . .").

In addition, Plaintiff's invocation of the federal "misbranding" provisions does not spare her claim from dismissal.  As a federal court explained when rejecting a claim predicated on a manufacturer's purported failure to submit a supplemental PMA application, any "[c]laims premised on [the] derivative assertion that the . . . device . . . was 'adulterated' or 'misbranded' . . . are also preempted."  *Purchase*, 896 F. Supp. 2d at 696.  And as a federal court in Georgia held when dismissing a claim based on "alleg[ations] that Medtronic violated the FDCA's prohibition against adulteration and misbranding," such a claim "would not exist prior to the enactment of the FDCA misbranding and adulteration" provisions and is therefore "impliedly preempted by § 337(a)."  *Leonard v. Medtronic, Inc.*, 2011 U.S. Dist. LEXIS 93176, at *23 (N.D. Ga. Aug. 19, 2011).  Accordingly, "to the extent that Plaintiff seeks to ground her . . . claims on allegations that Defendant violated the FDCA—namely, by selling a misbranded and adulterated product—these claims are *impliedly* preempted pursuant to 21 U.S.C. § 337(a)."  *Franklin v. Medtronic, Inc.*, 2010 U.S. Dist. LEXIS 71069, at *22 (D. Colo. May 12, 2010) (citation omitted) (emphasis in original), *report and recommendation adopted*, 2010 U.S. Dist. LEXIS 61889 (D. Colo. June 22, 2010).

To the extent Plaintiff is claiming "misbranding" based on Medtronic's purported failure to provide adequate warnings as required by FDA, Am. Compl. ¶ 260, Plaintiff has in no way alleged, nor can she, that any federal violation from any alleged failure to revise Infuse's label caused her injuries.  Given that the Infuse label[12] explicitly warned of the very risks Plaintiff claims to have encountered, Plaintiff cannot allege – as she must, to avoid preemption, *see Erickson*, 846 F. Supp. 2d at 1092; *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 282 (E.D.N.Y. 2009) – that her supposed injuries are

---

[12] RJN, Ex. B.

1    causally connected to any purported failure to provide additional warnings.  *See, e.g.,*

2    *Rounds v. Genzyme Corp.*, 440 F. App'x 753, 754-55 (11th Cir. 2011) (*per curiam*) (no

3    liability where manufacturer "expressly and clearly warned [the plaintiffs physician] . . .

4    about the risk of the exact injury of which the [plaintiff] now complain[s]").[13]

### D.    Plaintiff's Manufacturing-Defect Claims Fail Because Plaintiff Does Not Adequately Allege a Manufacturing Defect

7         The Amended Complaint purports to allege a manufacturing-defect claim

8    regarding the Class II cages, Am. Compl. ¶¶ 169-202, but it fails to adequately allege any

9    manufacturing defect.  Under Arizona law, a manufacturing defect exists when, because

10   the product was not manufactured or assembled in accordance with its specifications,

11   there is a defect in the product at the time it leaves the manufacturer's hands.  *Gomulka v.*

12   *Yavapai Mach. & Auto Parts Inc.*, 745 P. 2d 986, 988-89 (Ariz. Ct. App. 1987) (a

13   manufacturing defect occurs when something goes wrong in the manufacturing process

14   and the product is not in its intended condition); *see also Hearn v. R.J. Reynolds Tobacco*

15   *Co.*, 279 F. Supp. 2d 1096, 1115 (D. Ariz. 2003) (in Arizona, to determine the existence

16   of a manufacturing defect, the product is compared to other products in the same line).

17        Here, Plaintiff's Amended Complaint fails to show the existence of any

18   manufacturing defect in her cage devices.  She does not present even a single allegation

19   showing that the devices that she received in any way failed to conform to the standards

20   of other units of the device.  Instead, Plaintiff makes the conclusory allegation that "*due*

---

[13] While Plaintiff cites to the Arizona Consumer Fraud Act, it is unclear what claims she is making under that statute.  Any such claims, however, should be dismissed for the same reasons stated by this Court and affirmed by the Ninth Circuit in dismissing Plaintiff's earlier fraud claims – Plaintiff cannot show reliance on any alleged misrepresentation.  Nor has she alleged (nor can she allege) any proximate cause between any violation of the Consumer Fraud Statute and any of her injuries.  *See Correa v. Pecos Valley Dev. Corp.*, 617 P.2d 767, 771 (Ariz. Ct. App. 1980) (holding, as quoted in the Ninth Circuit's opinion, that "[t]he requisites of a private cause of action for a statutory fraud [claim] are a false promise or a misrepresentation made in connection with the sale or advertisement of merchandise and the consumer's consequent and proximate injury" which "occurs when the consumer relies on the misrepresentation."); *see also Steinberger v. McVey*, 318 P.3d 419, 435 (Ariz. Ct. App. 2014) (A plaintiff must plead all of the elements of a consumer fraud with particularity).  Nor has Plaintiff even attempted to allege any claims under this statute meeting the rigorous test for parallel claims.  *See* 2015 Order at 7-8.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*to manufacturing defects – she has been harmed, injured and damaged by the migration, subsidence, and expulsion of the Medtronic [polymer cages].*"  Am. Compl. ¶181 (italics in original).  She also alleges that the cages "fail[ed] to contain the Medtronic Infuse Bone Graft biologic material at the implant sites long enough for fusion to occur."  Am. Compl. ¶185.  These allegations, however, do not allege *any* facts that, if true, would establish that the Infuse Device deviated from *any* particular design or manufacturing specification.  Moreover, the allegation that Plaintiff experienced migration of components is not evidence that the Device deviated from its intended design, because the FDA-mandated Infuse label warns that this side effect is known to occur when the product is correctly manufactured according to all FDA specifications.  *See* RJN, Ex. B ("migration of components" as "potential adverse events which may occur with spinal fusion surgery with the InFUSE bone graft").

Given the hostile environment of the human body, implantable medical devices may not achieve a successful result for a variety of reasons unrelated to any defect in manufacture or deviation from FDA/PMA requirements.  *See*, *e.g.*, *Walker v. Medtronic, Inc.*, 670 F.3d 569, 580 (4th Cir. 2012) (the "safety and reliability" of an implanted device "cannot be guaranteed indefinitely in the 'extremely hostile environment of the human body,' where myriad other factors external to the device are brought to bear.").  Even a properly designed and manufactured Class II device will sometimes malfunction; the mere fact that something went wrong does not mean that the Device was defective.  *See Santos-Rodriguez v. Seastar Sols.*, 858 F.3d 695, 698-99 (1st Cir. 2017); *Wu v. EAN Holdings, LLC*, 2014 U.S. Dist. Lexis 4010, at *13 (N.D. Cal. Jan. 10, 2014) (inference of defect cannot be drawn solely from the fact of an accident); *see also* 2015 Order at 21 n. 23.  Accordingly, Plaintiff's manufacturing-defect claims must be dismissed.  *See Flores v. City of Phoenix*, 2012 U.S. Dist. LEXIS 11732, at *4 (D. Ariz. Feb. 1, 2012) ("[T]o survive a motion to dismiss, . . . a complaint must contain more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action[.]'").

**E.      Plaintiff's Class II Cage Design-Defect Claims Fail Because She Does Not Adequately Allege a Design Defect and Are Preempted**

Plaintiff's design-defect claims as to the Class II cages must be dismissed because they do not adequately allege a defect.  To state a design-defect claim under Arizona law, plaintiffs must identify a particular defect in the design of a product.  *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1194-95 (9th Cir. 2007) (applying Arizona law and affirming dismissal of design defect claim where the plaintiff failed to explain the defect that formed the basis of her claim; although "a RT nail failure is rare, . . . rarity does not indicate infallibility").  But nowhere in the Amended Complaint does Plaintiff identify what was purportedly defective about the Infuse Device's design, about any cage design, or about any claimed defect in the cages that caused them to inadequately contain the rhBMP-2.  Instead, Plaintiff makes the conclusory allegation that "*her spine's failure-to-fuse is due to design defects*," Am. Compl. ¶ 234 (emphasis in original), followed by a history of possible side effects from the Device's labelling, concluding that the Device was defective because she "suffers from each of the eight adverse conditions listed above."  *Id.* ¶¶ 237-38; *see id.* ¶ 242 (alleging that the design of the Device, including cages, "is responsible, in part for the above adverse conditions").

Moreover, in addition to not stating a cage-based design-defect claim that satisfies Rule 8, *see Iqbal*, 556 U.S. at 678, Plaintiff's Class II cage design-defect claims are impliedly preempted.  According to Plaintiff, Am. Compl. ¶ 172, the cages at issue were approved by FDA through the § 510(k) (substantial equivalence) process.  But any claim that Medtronic should have altered the design of such a device would be impliedly preempted.  To obtain a § 510(k) approval, a manufacturer must prove that the device is "'substantially equivalent' to a pre-existing device," *Lohr*, 518 U.S. at 478, and "products entering the market through § 510(k) may be marketed only so long as they remain substantial equivalents of the" earlier device, *Riegel*, 552 U.S. at 322.  This on-going duty of sameness bars any claim that would require a manufacturer to change the 510(k) device's design.  *Pliva, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) ("federal duty of

'sameness'" impliedly preempted claim that generic drug manufacturer was required to change label). Nor can Plaintiff's claim be that Medtronic should have stopped selling any FDA-approved cage, as such a claim would also be impliedly preempted. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013). The Ninth Circuit affirmed this Court's dismissal of Plaintiff's Class III device design-defect claims. Plaintiff's design-defect claims as to her Class II cages should be dismissed as well.[14]

## V.     CONCLUSION

For the above reasons, Plaintiff's claims should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 31st day of January, 2019.

LEWIS ROCA ROTHGERBER                    PEPPER HAMILTON LLP
CHRISTIE LLP

By: */s/ Stephen M. Bressler*                        By: */s/ Kenneth J. King*
    Stephen M. Bressler                                  Kenneth J. King
                                                         Sean P. Fahey
                                                         Admitted *Pro Hac Vice*

*Attorneys for Defendants*

---

[14] This Court previously found Plaintiff's claims avoid express preemption to the extent they target certain cages, on the ground that those cages are Class II rather than Class III devices, not subject to the PMA process or § 360k(a). 2015 Order at 10-11. This cage-centric analysis is inconsistent with other courts' decisions. In *Hafer*, for example, plaintiffs "allege[d] that the fusion cages used in their surgeries were Class II medical devices not subject to the . . . PMA process," and argued their claims thus escaped preemption under § 360k(a). 99 F. Supp. 3d at 853. The court rejected that assertion on grounds, applying equally here. First, the court recognized, "the gravamen of Plaintiffs' claims is against the 'off-label' use of the BMP/Sponge," *i.e.*, the bone-graft component of the Infuse device. *Id.* at 858. That the *Hafer* plaintiffs' claims arose from off-label use of Infuse's bone-graft component rather than Class II cages was evidenced by the fact that "some of the Plaintiffs did not even claim the use of a Class II Cage," and plaintiffs' complaint "d[id] not refer to a specific misrepresentation as to any specific Class II cage." *Id.* Both of those facts are true here - where in one of Plaintiff's surgeries the surgeons did not use any cage at all, Am. Compl. ¶ 6, and where the Amended Complaint does not allege any specific representation about any Class II cage.

Second, the FDCA "defines device as 'an instrument, . . . implant, . . . , ***including any component***, part, or accessory.'" *Hafer*, 99 F. Supp. 3d at 858 (quoting 21 U.S.C. § 321(h)) (emphasis in original). Thus, almost every court presented with the question has held that "premarket approval is as controlling of the individual components . . . as it is to the device as a whole." *Hawkins v. Medtronic, Inc.*, 2014 U.S. Dist. LEXIS 11779, at *14 (E.D. Cal. Jan. 30, 2014); *accord, e.g.*, *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1003 (S.D. Ohio 2016); *Beavers-Gabriel*, 15 F. Supp. 3d 1021, 1033 (D. Haw. 2014); *Houston v. Medtronic, Inc.*, 957 F. Supp. 2d 1166, 1176 (C.D. Cal. 2013); *Gavin v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 101216, at *37 (E.D. La. July 19, 2013).

1

**CERTIFICATE OF SERVICE**

2

3

4

      I hereby certify that on January 31, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and served the attached document by mail, on the following, who is not a registered participant of the CM/ECF System:

5

6

7

8

Kathryn Marie Jones
P.O. Box 72107
Phoenix, AZ 85050
Plaintiff Pro Se

9

10

11

12

                              */s/ Tracy Rhodes*
                              Tracy Rhodes

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28