**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathryn Marie Jones, | No. CV-14-00383-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| Medtronic Incorporated, et al., | |
| Defendants. | |

Before the Court is Defendants Medtronic Incorporated ("Medtronic Inc."), Medtronic Sofamor Danek USA Incorporated ("Sofamor Danek"), Medtronic PLC, Medtronic, Medtronic Sofamor Danek, and Medtronic Spinal & Biologics (together, the "Defendants") Motion to Dismiss Plaintiff's Amended Complaint (Doc. 85) (the "Motion"). The Motion was fully briefed on April 1, 2019. (Docs. 97, 98) Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. See LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998). The Court's ruling is as follows.

**I. Background**

On October 26 and 27, 2010, Kathryn Marie Jones (the "Plaintiff") underwent three spinal fusion surgeries at a hospital in Dallas, Texas. (Doc. 77 at 1) During the course of her surgeries, the Plaintiff was implanted with four Medtronic PEEK polymer Clydesdale intervertebral body fusion devices and one Medtronic PEEK polymer Capstone

intervertebral body fusion device (together, the "PEEK Devices"). (Doc. 77 at 4) The Plaintiff alleges that 14[1] doses of Medtronic Infuse Bone Graft biological material was "splashed" onto her spine during the course of the surgery, and one Medtronic titanium CD Horizon spinal fixation system was also implanted. (Doc. 97 at 4, 42) The Plaintiff's spine failed to fuse, and the Plaintiff suffers a myriad of physical ailments as a result of the unsuccessful surgery. (Doc. 77 at 7–8, 50–52)

The Plaintiff filed the FAC alleging various product liability claims, among other claims. (Doc. 77) In summary, the Plaintiff alleges that the Medtronic Infuse Bone Graft biological material was not supposed to be used with the PEEK Devices. (Doc. 77 at 4) The Plaintiff alleges that a different spinal fusion product, the Medtronic Infuse Bone Graft/LT-Cage Lumbar Tapered Fusion Device (the "LT-Cage Device"), was designed and manufactured for use with the Medtronic Infuse Bone Graft biological material. (Doc. 77 at 3) The Plaintiff was not implanted with the LT-Cage Device.[2] (Doc. 77 at 4) The Plaintiff alleges that the PEEK Devices "migrate, subside and are expulsed," which does not allow the PEEK Devices to contain the Medtronic Infuse Bone Graft biological material for a long enough period for spinal fusion to occur. (Doc. 77 at 4)

The Plaintiff filed the FAC on January 3, 2019. (Doc. 77) On January 31, 2019, the Defendants filed the Motion seeking to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Doc. 85)

**II. Legal Standard**

**A. FRCP 12(b)(2)**

"[T]he plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). Where, as here, a defendant's motion to dismiss is based on a written record and no evidentiary hearing is held, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* "For a court to

---

[1] In Paragraph 153 of the First Amended Complaint (the "FAC"), the Plaintiff reports 19 doses. (Doc. 77 at 42)
[2] The LT-Cage Device is a combination product comprised of (i) Medtronic Infuse Bone Graft biological material, (ii) an absorbable collagen sponge, and (iii) a Medtronic titanium Lordotec interverbal body fusion device. (Doc. 77 at 4)

2

exercise personal jurisdiction over a non-resident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110–11 (9th Cir. 2002) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 781, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). When no federal statute specifically defines the extent of personal jurisdiction, federal courts look to the law of the state where the district court sits—in this case, Arizona. *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1110 (9th Cir. 2004). "Arizona's long-arm rule permits the exercise of personal jurisdiction to the extent allowed by the due process clause of the United States Constitution." *Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1188 (9th Cir. 2002).

Personal jurisdiction may be either general or specific. See *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citing *Int'l Shoe*, 326 U.S. at 317).

In deciding whether a defendant is subject to specific personal jurisdiction, federal courts consider whether (1) the non-resident defendant purposefully directs his activities or consummates some transaction with the forum or resident thereof; or performs some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e. it must be reasonable. *Picot*, 780 F.3d at 1211 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.

2004). The plaintiff has the burden of proving the first two prongs. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011). If he does so, the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). For claims sounding in tort, courts apply a "purposeful direction" test and look to evidence that the defendant has directed his actions at the forum state, even if those actions took place elsewhere. *Schwarzenegger*, 374 F.3d at 802.

### B. FRCP 12(b)(6)

To survive a FRCP 12(b)(6) motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The Court may dismiss a complaint for failure to state a claim under FRCP 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, and (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacificia Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

In deciding a motion to dismiss, the Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). In comparison, "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" are not entitled to the assumption of truth, and "are insufficient to defeat a motion to dismiss for failure to state a claim." *Id.*; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A plaintiff need not prove the case on the pleadings to survive a motion to dismiss. *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012).

## III. Analysis

### A. <u>FRCP 12(b)(2) Lack of Personal Jurisdiction</u>

The Defendants seek dismissal of the FAC because the Court does not have

4

personal jurisdiction over any of the Defendants. The Defendants argue that the parties identified as Medtronic, Medtronic Sofamor Danek, Medtronic Spinal & Biologics are not legal entities, and the Plaintiff does not dispute this fact. Accordingly, the Court finds that the defending parties identified as Medtronic, Medtronic Sofamor Danek, and Medtronic Spinal & Biologics shall be dismissed from this action with prejudice.

The Defendants argue that the Court does not have personal jurisdiction over the remaining Defendants in this case because the Plaintiff fails to establish general or specific personal jurisdiction. Medtronic Inc. is a corporation incorporated under the laws of Minnesota with its principal place of business in Minneapolis, Minnesota. (Doc. 85 at 7) Sofamor Danek is a corporation incorporated under the laws of Tennessee with its principal place of business in Memphis, Tennessee. (Doc. 85 at 8) Medtronic PLC is a public limited holding company organized under the laws of Ireland, and its principal place of business is in Dublin, Ireland. (Doc. 85 at 8) Furthermore, the surgery giving rise to the Plaintiff's injury was performed in Dallas, Texas. (Doc. 77 at 1) In response, the Plaintiff argues that (i) the Defendants' motion for lack of personal jurisdiction is untimely, and (ii) the Defendants consented to personal jurisdiction in the Maricopa County Superior Court before removing the case. (Doc. 97 at 13–14)

1. Medtronic Incorporated

A party waives the defense of lack of personal jurisdiction if the defense is not asserted in its first motion to dismiss. Fed. R. Civ. P. 12(h)(1); *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) (stating "Defendants can waive the defect of lack of personal jurisdiction by appearing generally without first challenging the defect in a preliminary motion."). On March 19, 2014, Medtronic Inc. filed a motion to dismiss (Doc. 17) the Plaintiff's original complaint (Doc. 1-2) in this case. Medtronic Inc.'s first motion to dismiss did not argue that the Court lacked personal jurisdiction over it. Therefore, the Court finds that Medtronic Inc. has waived this defense, and the Court can assert personal jurisdiction over it.

### 2. Medtronic Sofamor Danek USA Incorporated

The Plaintiff's original complaint (Doc. 1-2) asserts claims against Medtronic Inc. and Medtronic Sofamor Danek USA, Inc. (Doc. 1-2 at 2) Sofamor Danek did not join in Medtronic Inc.'s first motion to dismiss (Doc. 17), and it does not appear that Sofamor Danek appeared in the case at all prior to the Court's dismissal of the case on March 6, 2015. (Doc. 65) It appears to the Court that the Motion is the first time that Sofamor Danek has appeared in the case; thus, Sofamor Danek's defense of lack of personal jurisdiction is properly considered by the Court.

First, the Court finds that it does not have general personal jurisdiction over Sofamor Danek because the corporation is not incorporated under the laws of Arizona, and it does not host its headquarters or principal place of business in the state of Arizona. (Doc. 85 at 8); See *AM Tr. v. UBS AG*, 681 F. App'x 587, 588 (9th Cir. 2017) (stating "a corporation is typically subject to general personal jurisdiction only in a forum where it is incorporated or where it maintains its principal place of business").

Separately, the Court finds that it does not have specific personal jurisdiction over Sofamor Danek. As discussed, the Court considers a three-part test to determine whether Sofamor Danek has sufficient contacts with the state of Arizona. The Court finds that the Plaintiff fails to sufficiently argue that Sofamor Danek purposefully directed its activities or performed an act that resulted in it availing itself of the laws of Arizona. The Plaintiff does not assert which of the Defendants "maintains a manufacturing/distribution center in the Tempe metropolitan area". (Doc. 77 at 3) Therefore, the fact that one or all of the Defendants prospectively transact business in Arizona is insufficient for the Court to find that Sofamor Danek surrendered to personal jurisdiction in this case. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). Furthermore, the Plaintiff fails to allege that any of her claims arise out of or relate to the Defendants' forum-related activities. The surgery giving rise to the Plaintiff's injury did not occur in Arizona, and the Plaintiff's status as a resident of Arizona is insufficient to confer personal jurisdiction over Sofamor Danek. (Doc. 77 at 1) Accordingly, the Court finds that it does not have personal jurisdiction

over Sofamor Danek in this case, and the Motion will be granted as to Sofamor Danek.

   3. Medtronic PLC

The Plaintiff did not include Medtronic PLC in her original complaint. (Doc. 1-2) Medtronic PLC was added as a defending party to this case in the FAC; thus, Medtronic PLC's defense of lack of personal jurisdiction is properly considered by the Court. (Doc. 77 at 2)

The Court finds that it does not have general personal jurisdiction over Medtronic PLC because the public limited holding company is not organized under the laws of Arizona, and it does not host its headquarters or principal place of business in the state of Arizona. (Doc. 85 at 8) Separately, the Court finds that it does not have specific personal jurisdiction over Medtronic PLC. Again, the Plaintiff fails to sufficiently allege that Medtronic PLC purposefully directed its activities or performed an act that resulted in it availing itself of the laws of Arizona. The Plaintiff does not assert which of the Defendants "maintains a manufacturing/distribution center in the Tempe metropolitan area". (Doc. 77 at 3) Thus, the Court finds that the fact that one or all of the Defendants prospectively transact business in Arizona is insufficient to find that Medtronic PLC surrendered to personal jurisdiction in this case. *Daimler*, 571 U.S. at 139 (2014). Furthermore, the Plaintiff fails to allege that any of her claims arise out of or relate to Medtronic PLC's forum-related activities. The surgery giving rise to the Plaintiff's injury did not occur in Arizona, and the Plaintiff's status as a resident of Arizona is insufficient to confer personal jurisdiction over Medtronic PLC. (Doc. 77 at 1) Accordingly, the Court finds that it does not have personal jurisdiction over Medtronic PLC in this case, and the Motion will be granted as to Medtronic PLC.

**B. FRCP 12(b)(6) – Failure to State a Claim**

   1. Manufacturing Defect

The Plaintiff alleges a manufacturing defect claim, arguing that the PEEK Devices had a manufacturing defect because the PEEK Devices had a "tendency to migrate, subside, and be expulsed from the implant site." (Doc. 77 at 45) To establish a prima

facie case for strict products liability in Arizona, a plaintiff must show that the product was in a defective condition (when it left the defendant's hands), that the defect made the product unreasonably dangerous, and that the defect was a proximate cause of plaintiff's injuries. *Sw. Pet Prod., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1051 (D. Ariz. 2003) (citing *Jimenez v. Sears, Roebuck and Co.*, 904 P.2d 861 (1995)). A defectively manufactured product is one that is flawed as a result of something that went wrong during the manufacturing process. *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 241–42 (Ct. App. 1987).

The Court finds that the Plaintiff fails to adequately allege that the PEEK Devices contained manufacturing defects. The Plaintiff's conculsory recitation that the PEEK Devices were "defective and unreasonably dangerous" is insufficient to state a plausible claim. (Doc. 77 at 45) The Plaintiff's allegation that the PEEK Devices failed to perform safely is not a manufacturing defect, because that statement does not allege that there was an issue with the manner in which the PEEK Devices were manufactured. (Doc. 77 at 45) The Plaintiff's allegation that the Defendants' added a titanium coating to the PEEK Devices in 2014 is not sufficient to support a manufacturing defect claim, because that statement alone does not allege that there was an issue with the manner in which the PEEK Devices were manufactured. (Doc. 77 at 47) The Plaintiff's statement that the PEEK devices failed to "contain Medtronic Infuse Bone Graft biological material at the implant sites" is not a manufacturing defect. (Doc. 77 at 47) Put simply, the Plaintiff fails to allege that the PEEK Devices were defective due to an error that occurred during the manufacturing process. Furthermore, aside from the threadbare recitation that the PEEK Devices are "unreasonably dangerous," the Plaintiff fails to offer any additional facts demonstrating how the devices are dangerous. Accordingly, the Motion will be granted as to the Plaintiff's manufacturing defect claim.

2. Design Defect

The Plaintiff also alleges a design defect claim, arguing that the Medtronic CD Horizon Spinal Fixation System had design defects that prevented her spine from fusing.

(Doc. 77 at 59) A defectively designed product is one that is made as the manufacturer intended it to be but that is unreasonably dangerous. *Gomulka*, 745 P.2d 986, 989 (Ct. App. 1987). Arizona courts can apply multiple tests to determine whether a product is unreasonably dangerous. *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1194 (9th Cir. 2007). A negligence design defect claim begins with the assertion that a manufacturer produced a product that fails to meet "the purpose for which it is designed." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1194 (9th Cir. 2007). A negligent design case focuses on whether the defendant's conduct was reasonable in view of a foreseeable risk at the time of design of the product. *St. Clair v. Nellcor Puritan Bennett LLC*, 2011 WL 5331674, at 5 (D. Ariz. Nov. 7, 2011).

One type of strict liability design defect claim arises when a product is in a "defective condition unreasonably dangerous" and the product "fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner;" for this type of claim, courts employ the "Consumer Expectation Test." *Stilwell*, 482 F.3d at 1194. The Consumer Expectation Test finds that a defective product is unreasonably dangerous when its inherent danger exceeds the expectation of the ordinary user or consumer. *Gomulka*, 745 P.2d at 989. The Consumer Expectation Test does not apply to bystanders, at least in design defect cases, because a person who is not using the product may be entirely ignorant of its properties and of how safe it could be made. *Id*.

Separately, another type of strict liability design defect claim arises when "the benefits of a challenged design do not outweigh the risk of danger inherent in the design;" for this type of claim, courts employ a risk/benefit analysis. *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 879 (1985); *Stilwell,* 482 F.3d at 1194. A strict liability design defect claim where the risk/benefit analysis is appropriate focuses on the quality of the product. *St. Clair*, 2011 WL 5331674 at 5 (citing *Golonka*, 65 P.3d at 963). "To the extent the risk/benefit analysis involves a consideration of the conduct of the manufacturer or seller, such conduct is weighed as if the risk that the trial has revealed has always been known."

*Id.*[3] The fact-finder employs a "'hindsight' test to decide whether it was reasonable for a manufacturer with [knowledge of the product's potentially dangerous consequences, as demonstrated at trial,] to have put the product on the market." *Id.* (citing *Gomulka*, 745 P.2d at 989). "The knowledge of the risk attendant on a product's harmful characteristics is attributed to the manufacturer or seller as a matter of law," and "it is immaterial whether the manufacturer knew or should have known of the risk accompanying a product's harmful characteristics at the time the product was put on the market." *Gomulka*, 745 P.2d at 989.

The Plaintiff's design defect claim does not clearly identify whether it is a claim based in negligence or strict liability. It is the Court's understanding that the gist of the Plaintiff's claim is that the Medtronic CD Horizon spinal fixation system was not designed to be used with the PEEK Devices because the Medtronic CD Horizon spinal fixation system was not designed to accommodate the biochemical environments created by a combination of the PEEK Devices and the Medtronic Infuse Bone Graft biological material. (Doc. 77 at 59–64) The Plaintiff's claim does not fit squarely into any of the aforementioned analyses, so in an abundance of caution, the Court will apply them all.

In order to assert a design defect claim based in negligence, the Plaintiff needs to provide factual allegations to support the claim that the Medtronic CD Horizon spinal fixation system fails to meet the purpose for which it was designed. In the FAC, the Plaintiff alleges that the Medtronic CD Horizon spinal fixation system is designed to "stabilize the operative site during the normal healing process." (Doc. 77 at 60) However, the Plaintiff fails to allege that the Medtronic CD Horizon spinal fixation system has a defect or failed to meet the purpose for which it was designed. Instead, the Plaintiff

---

[3] In the risk benefit analysis, courts weigh factors such as (1) the product's usefulness and desirability; (2) the availability of safer products to meet the same need; (3) the likelihood and probable seriousness of injury; (4) the obviousness of the danger; (5) common knowledge and normal public expectation of the danger (particularly for established products); (6) the avoidability of injury by care in the use of the product (including the effect of instructions or warnings); and (7) the manufacturer's or seller's ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive. *Gomulka*, 745 P.2d 986, 989 (Ct. App. 1987).

toggles between arguing that the PEEK Devices caused the Medtronic CD Horizon spinal fixation system to fail and the Medtronic CD Horizon spinal fixation system is defective because it was not designed for use in conjunction with the PEEK Devices. (Doc. 77 at 61–64) The Plaintiff alleges that the misuse of the PEEK Devices and the Medtronic Infuse Bone Graft biological material resulted in her spine failing to fuse, and, as a result, the Medtronic CD Horizon spinal fixation system was not able to stabilize her spine during the healing process. (Doc. 77 at 61–62, 64) However, the FAC clearly states that the manual for the Medtronic CD Horizon spinal fixation system clearly expected for the device to "pull out, bend or fracture" in the absence of spinal fusion. (Doc. 77 at 60–61) Thus, the Court finds that the allegations in the FAC demonstrate that the Medtronic CD Horizon spinal fixation system performed exactly as it would have been expected to perform in the event that the Plaintiff's spine failed to fuse.

In order to assert a design defect claim based in strict liability, the Plaintiff must either allege (i) that the Medtronic CD Horizon spinal fixation system was unreasonably dangerous and failed to perform in a reasonably safe manner or (ii) that the benefits of the Medtronic CD Horizon spinal fixation system's design do not outweigh the risk of danger inherent in such design. As discussed, the Plaintiff's primary contention with the Medtronic CD Horizon spinal fixation system is that it was not designed to support use with the PEEK Devices and the Medtronic Infuse Bone Graft biological material. However, at no point in the FAC does the Plaintiff allege that the Medtronic CD Horizon spinal fixation system was unreasonably dangerous or that there were inherent risks of danger present in the Medtronic CD Horizon spinal fixation system's design. Instead, the bulk of the FAC alleges that the use of Medtronic Infuse Bone Graft biological material on the PEEK Devices was improper, and, as a result, the Medtronic CD Horizon spinal fixation system was impacted and unable to be removed. (Doc. 77 at 6, 60) The Court finds that these allegations are insufficient to plead a plausible strict liability design defect claim. Accordingly, the Motion will be granted as to the Plaintiff's design defect claim.

### 3. Failure to Warn

The Plaintiff alleges a failure to warn claim, presumably under Arizona law, arguing that the Defendants failed to revise the label and warning information for the LT-Cage Device as required by a notice from the Food and Drug Administration. (Doc. 77 at 52) In order to avoid preemption, a plaintiff has to sue for conduct that violates a federal requirement (avoiding express preemption), but cannot sue only because the conduct violates that federal requirement (avoiding implied preemption). *Conklin v. Medtronic, Inc.*, 431 P.3d 571, 576 (2018). In this case, the Plaintiff argues that because the label for the LT-Cage Device failed to contain certain warnings required by the Food and Drug Administration, the Plaintiff was implanted with the PEEK Devices when she should not have been.

On January 31, 2019, the Defendants filed a request for judicial notice, in which the Defendants requested for the Court to take judicial notice of three documents produced by the Food and Drug Administration and the medical label for the Defendants' "Infuse Bone Graft/LT-Cage Lumbar Tapered Fusion Device" from June 2009. (Doc. 88) The request was unopposed, and the Court will consider the judicially noticed information in its analysis. *Ramirez v. Medtronic Inc.*, 961 F. Supp. 2d 977, 983 (D. Ariz. 2013) (stating a court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to [a plaintiff's] pleading" and "a court may take judicial notice of 'matters of public record outside the pleadings.'") Thus, it is appropriate for the Court to consider the Food and Drug Administration-approved label for the LT-Cage Device from June 2009 (Doc. 88-4), as it is a public record and the label's authenticity was not disputed between the parties. *Id.*

The Defendants proffer a copy of the LT-Cage Device label from June 2009, which expressly reads "[t]he Infuse Bone Graft component must not be used without the Medtronic Titanium Threaded Interbody Fusion Device component." (Doc. 88-4 at 5) The Defendants argue that the proffered label from June 2009 would have been the operative label at the time of the Plaintiff's surgery in 2010. (Doc. 85 at 12) The Plaintiff

admits that she has only been able to find warning labels from 2002 and 2015. (Doc. 77 at 53) Furthermore, in her response to the Motion, the Plaintiff primarily argues that the LT-Cage Device medical label from 2015 failed to include the proper warnings. (Doc. 97 at 8) Even taking the facts in the light most favorable to the Plaintiff, the Court finds that the Plaintiff does not plausibly allege a failure to warn claim under Arizona law. The Plaintiff cannot confirm that the medical label from 2002 was the label available to her surgeon during her surgery, and the Court finds that the medical label from 2015 is irrelevant to its analysis. Without any facts to contradict the language present in the 2009 label, the Court finds that the allegedly missing warnings are clearly present in the LT-Cage Device label from 2009. (Doc. 88-4) Accordingly, the Motion will be granted on the Plaintiff's failure to warn claim.

*4.* Adulteration

The Plaintiff alleges an adulteration claim pursuant to Arizona Revised Statutes §§ 32-1965 and 1966, arguing that the Defendants violated Arizona law by substituting the PEEK Devices for the LT-Cage Device during her surgery. (Doc. 77 at 66) Section 32-1965 states "[t]he adulteration or misbranding of any drug, device, poison, or hazardous substance" is prohibited. Ariz. Rev. Stat. Ann. § 32-1965. Section 1966 states "A drug or device shall be deemed to be adulterated . . . [i]f it is a drug or device to which any substance has been mixed or packed therewith so as to reduce its quality or strength, or to be substituted for it in whole or in part." Ariz. Rev. Stat. Ann. § 32-1966. The Court finds that the Plaintiff's adulteration claim immediately fails because none of the Defendants are physicians or surgeons who practice medicine. The basis of the Plaintiff's adulteration claim is that the Defendants "produced adulterated products when it substituted" the PEEK Devices for the LT-Cage Device. (Doc. 77 at 66) The substitution that the Plaintiff complains of could only have been performed by the Plaintiff's surgeon, who is not party to this lawsuit. Accordingly, the Motion will be granted as to the Plaintiff's adulteration claim.

*5.* Misbranding

The Plaintiff alleges a misbranding claim claim pursuant to Arizona Revised Statutes §§ 32-1965 and 1967, arguing that the Defendants misbranded the new product created by substituting the PEEK Devices for the LT-Cage Device during her surgery. (Doc. 77 at 66) Section 1967 states "A drug or device is misbranded . . . [u]nless its labeling bears both: (a) [a]dequate directions for use" and "(b) [a]dequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in a manner and form as are necessary for the protection of users." Ariz. Rev. Stat. Ann. § 32-1967. The Court finds that the Plaintiff's misbranding claim immediately fails. The basis of the Plaintiff's misbranding claim is that the Defendants "produced misbranded products when [they] failed to provide adequate instructions for use . . . for the new combination products created by the substitution of" the PEEK Devices for the LT-Cage Device. (Doc. 77 at 66) This claim flies in the face of logic, as the basis of this lawsuit is that the PEEK Devices were improperly combined with Medtronic Infuse Bone Graft biological material when the biological material was only supposed to be used with the LT-Cage Device. The Plaintiff cannot plausibly argue that the Defendants are liable for misbranding the "drug or device" resulting from the allegedly improper substitution of the PEEK Devices for the LT-Cage Device, when the Plaintiff also argues that the substitution improperly exists. Accordingly, the Motion will be granted as to the Plaintiff's misbranding claim.

//
//
//
//

Accordingly,

**IT IS ORDERED** that the Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 85) is **granted**; and

**IT IS FURTHER ORDERED** that the Clerk of Court should terminate this case and enter judgment accordingly.

Dated this 14th day of August, 2019.

Honorable Steven P. Logan
United States District Judge